**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

AMBE A. WODESSO,

        Plaintiff,

vs.

SPECIAL AGENT CHRISTOPHER
CANTRELL, SPECIAL AGENT
KARSTEN ANDERSON, SPECIAL
AGENT ANDREW LUND, and TASK
FORCE OFFICER JEFF TILSON,

        Defendants.

No. 12-CV-13-LRR

ORDER

_____

### *TABLE OF CONTENTS*

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   *STANDARD OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   *RELEVANT BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      *A.*    *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      *B.*    *Outside the Airport Terminal* . . . . . . . . . . . . . . . . . . . . . . . **5**
      *C.*    *Inside the Airport Terminal* . . . . . . . . . . . . . . . . . . . . . . . **6**
      *D.*    *Underlying Criminal Case* . . . . . . . . . . . . . . . . . . . . . . . . . **8**
      *E.*    *Wodesso's Claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

V.     *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
      *A.*    *Parties' Arguments* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
      *B.*    *Qualified Immunity Overview* . . . . . . . . . . . . . . . . . . . . . . **10**
      *C.*    *Relevant Fourth Amendment Precedent* . . . . . . . . . . . . . . . . . **12**
      *D.*    *Application* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
          *1.*    *Key facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
          *2.*    *Absence of clearly established law* . . . . . . . . . . . . . . . . . **18**

     3.     *Seizure* ................................... **20**
     4.     *Reasonable suspicion* ......................... **21**

**VI.**   **CONCLUSION** ...................................... **23**

## I. INTRODUCTION

The matter before the court is a "Motion to Dismiss and Motion for Judgment on the Pleadings" ("Motion") (docket no. 15).

## II. PROCEDURAL BACKGROUND

On November 29, 2011, Plaintiff Ambe A. Wodesso filed a "Petition and Jury Demand" ("Complaint") (docket no. 2) against Special Agent Christopher Cantrell, Special Agent Karsten Anderson, Special Agent Andrew Lund and Task Force Officer Jeff Tilson (collectively, "Defendants") in the Iowa District Court for Linn County. In his Complaint, Wodesso described his case as a *Bivens*[1] action, which seeks to establish individual liability against federal officials based on claimed violations of the United States Constitution. On January 24, 2012, Defendants removed the case to this court on the basis of federal question jurisdiction.

On March 24, 2012, Defendants filed the Motion pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Civil Procedure 12(c). On May 7, 2012, Wodesso filed a Resistance (docket no. 20). On May 14, 2012, Defendants filed a Reply (docket no. 21). The Motion is fully submitted and ready for decision.

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389 (1971) (recognizing cause of action brought directly under the United States Constitution against federal officials acting in their individual capacities for violations of constitutionally protected rights).

## III.  STANDARD OF REVIEW[2]

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal on the basis of "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  In determining whether a plaintiff has stated a claim sufficient to survive a Rule 12(b)(6) motion to dismiss, the court must accept all of the plaintiff's factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009).  With respect to the facts, "'[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record.'" *Illig v. Union Electric Co.*, 652 F.3d 971, 976 (8th Cir. 2011) (quoting *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010)); *accord Mulvenon v. Greenwood*, 643 F.3d 653, 656-57 (8th Cir. 2011); *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 387 (8th Cir. 2009).  A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl.*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl.*, 550 U.S. at 556);

---

[2] The court notes that "[j]udgment on the pleadings [under Federal Rule of Civil Procedure 12(c)] is appropriate when there are no material facts to resolve and the moving party is entitled to judgment as a matter of law." *Mills v. City of Grand Forks*, 614 F.3d 495, 497-98 (8th Cir. 2010).  The same standard of review applies to a motion to dismiss for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) and a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  *See Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 n.3 (8th Cir. 2010) (citing *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009)).

*see also Parkhurst v. Tabor*, 569 F.3d 861, 865 (8th Cir. 2009) ("[A] complaint must contain factual allegations sufficient 'to raise a right to relief above the speculative level. . . .'" (quoting *Bell Atl.*, 550 U.S. at 555)); *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (8th Cir. 2007) (examining federal pleading standards).

Although a plaintiff need not provide "detailed" facts in support of his or her allegations, the "short and plain statement" requirement of Federal Rule of Civil Procedure 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 677-78 (citing *Bell Atl.*, 550 U.S. at 555); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ("Specific facts are not necessary [under Rule 8(a)(2)]."). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl.*, 550 U.S. at 555). And, "[w]here the allegations show on the face of the complaint [that] there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate." *Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir. 2008) (citing *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997)).

## IV.  RELEVANT BACKGROUND

Accepting all of Wodesso's factual allegations as true and drawing all reasonable inferences in favor of him, the facts are as follows.

### A.  Players

Ambe A. Wodesso is a permanent resident alien of the United States.  Christopher Cantrell, Karsten Anderson and Andrew Lund are United States Immigration and Customs Enforcement ("ICE") Special Agents.  Special Agent Cantrell has been employed with ICE since 1994, Special Agent Lund has been employed with ICE since May of 2009 and Special Agent Anderson has been employed with ICE since June of 2009.  Jeff Tilson is an ICE Task Force Officer.  As such, he is authorized to identify and process removable

aliens in community settings.   Apart from assisting ICE, Task Force Officer Tilson performs his regular duties as the Chief of Police in Vinton, Iowa.

### B.  Outside the Airport Terminal

On January 14, 2010, Defendants were conducting a VIPR[3] operation at the airport in Cedar Rapids, Iowa.  The goal of such operation was to provide enhanced security. Special Agent Cantrell had been assigned to train Special Agent Lund and Special Agent Anderson.  Defendants, who were in plain clothes, and other individuals were standing outside on a covered walkway where interstate buses had a designated stop.  It was cold and windy outside.

Wodesso was riding on a bus that had departed from Minneapolis, Minnesota, that is, the city in which he lived.  He was wearing a black Pittsburgh Pirates baseball cap that had a red "P", rather than a yellow "P", and sneakers with red shoelaces.  Instead of wearing his baseball cap straight, Wodesso had placed it to the side.  At approximately 2:15 p.m., Wodesso's bus arrived at the airport.

Wodesso stepped off the bus and moved quickly to collect his luggage from under the bus.  Wodesso's luggage included a suitcase, a gym or duffle bag, a pillow and a box. Wodesso placed his luggage near Special Agent Lund and Special Agent Anderson and then walked across the fifteen-foot covered walkway to speak to a taxi driver.  He asked the taxi driver about getting a ride to North Liberty, Iowa.

After Wodesso spoke with the taxi driver, Special Agent Cantrell and Task Force Officer Tilson approached Wodesso.  Special Agent Lund and Special Agent Anderson did not approach Wodesso and remained about ten or fifteen feet away.  Upon approaching Wodesso, Special Agent Cantrell identified himself and utilized his wallet to display his badge and credentials.  At that time, he did not reveal either the badge or the firearm that were located on his belt.  After identifying himself, Special Agent Cantrell asked Wodesso

---

[3] VIPR is an acronym for "Visible Intermodal Prevention and Response."

for his identification, and Wodesso handed him a Minnesota commercial class driver's license, which bore Wodesso's name and likeness.  Special Agent Cantrell examined it.

Apart from asking Wodesso for identification, Special Agent Cantrell asked Wodesso several questions.  Special Agent Cantrell asked whether Wodesso was affiliated with any gang, where he was born and whether he had a criminal history.  Wodesso vehemently denied being involved with a gang and informed Special Agent Cantrell that he was from East Africa and had a criminal history.  Special Agent Cantrell followed up by asking Wodesso whether he was a citizen.  After being informed that he was not a citizen, Special Agent Cantrell inquired about Wodesso's status in the United States. Wodesso told Agent Cantrell that he was a permanent resident.  In response, Special Agent Cantrell requested to see Wodesso's green card.  Wodesso complied with such request by handing over his green card.  Special Agent Cantrell examined it.

Wodesso and Special Agent Cantrell remained outside for only a short period because Special Agent Cantrell asked Wodesso to accompany him inside the airport terminal, which was located a short distance away.  Even though he did not intend to enter the airport terminal at any time, Wodesso agreed to accompany Special Agent Cantrell inside.  As they proceeded into the airport terminal, Special Agent Cantrell passed Wodesso's license and green card to Special Agent Lund and asked him to verify Wodesso's information.  When moving inside, Defendants assisted Wodesso by carrying some of his luggage.  Special Agent Cantrell also guided Wodosso by lightly touching his shoulder.

### C.  Inside the Airport Terminal

Once just inside the public airport terminal which was located adjacent to the outdoor covered walkway, Special Agent Cantrell displayed his badge and firearm by tucking his shirt behind his holster.  Special Agent Cantrell did so to alert people who passed by that a law enforcement encounter was taking place.  Special Agent Lund, Special

Agent Anderson and Task Force Officer Tilson did not reveal their weapons. It, however, was apparent that they were with Special Agent Cantrell.

Soon after going inside the airport terminal, Special Agent Lund called dispatch to verify Wodesso's immigration status and inquire as to whether he had any outstanding arrest warrants. When he was making his call, Special Agent Lund stood approximately five to ten feet away from Wodesso and Special Agent Cantrell. Special Agent Anderson and Task Force Officer Tilson stood closer to Wodesso and Special Agent Cantrell.

While Special Agent Lund verified Wodesso's legal status and history, Special Agent Cantrell continued to question Wodesso. He again asked questions pertaining to gang affiliation and criminal history. He also requested to see Wodesso's tattoos. Wodesso answered Special Agent Cantrell's questions and complied with Special Agent Cantrell's request by revealing the tattoos that he had on arms. To reveal his tattoos, Wodesso took his coat off and pulled up the sleeves on his long-sleeve shirt. Wodesso's tattoos span much of his arms and are difficult to read. For the most part, Wodesso's tattoos include lettering, that is, quotes, words, statements or names, rather than designs. One of the tattoos appears to be a lengthy statement as to the Oromo people's struggle for liberation.[4] Special Agent Cantrell held onto Wodesso's wrist in order to read it. Another tattoo is also fairly lengthy and appears to include, among other things, his name.

After viewing Wodesso's tattoos, Special Agent Cantrell asked Wodesso whether his luggage contained anything illegal. Wodesso answered in the negative. Special Agent Cantrell then asked Wodesso for permission to take a look at his luggage. Wodesso gave

---

[4] It appears to read:
"THE STRUGGLE OF THE OROMO PEOPLE IS AN ATTEMPT TO AFFIRM THEIR OWN PLACE IN HISTORY. IT SEEKS EQUALITY, HUMAN DIGNITY, DEMOCRACY, FREEDOM & PEACE. IT IS NOT DIRECTED AGAINST THE MASS OF A PARTICULAR NATION OR NATIONALITY, NOR AGAINST INDIVIDUALS, BUT RATHER AGAINST ETHIOPIAN COLONIALISM!"

his consent.   Upon hearing Wodesso's response, Special Agent Anderson proceeded to search Wodesso's luggage.   At least five minutes but no more than ten minutes passed from the time that Special Agent Cantrell and Task Force Officer Tilson encountered Wodesso and the time that Special Agent Anderson searched Wodesso's luggage.

During his search of Wodesso's luggage, Special Agent Anderson looked inside a gym or duffle bag and found a smaller bag.   Special Agent Anderson found a plastic bag containing marijuana inside the smaller bag.   After discovering the marijuana, Special Agent Anderson placed Wodesso in handcuffs.   Following his arrest, Wodesso was held at the Linn County Correctional Center from January 14, 2010 to May 25, 2010.

### D.   Underlying Criminal Case

On February 2, 2010, a grand jury indicted Wodesso in *United States v. Wodesso*, Case No. 10-CR-10-LRR (N.D. Iowa 2010), for possession of marijuana and other offenses stemming from his encounter with Defendants.  On March 2, 2010, Wodesso filed a motion to suppress.   In such motion, Wodesso sought, among other things, the suppression of all of the items that Defendants seized during the search of his luggage.  On March 15, 2010, Magistrate Judge Jon S. Scoles issued a Report and Recommendation on the motion to suppress.  Judge Scoles determined that, although initially consensual, the encounter between Defendants and Wodesso evolved into a seizure for Fourth Amendment purposes because Defendants held onto Wodesso's driver's license and green card, Special Agent Cantrell placed his hand on Wodesso's shoulder while directing him inside the airport and, once inside the airport, three ICE agents surrounded Wodesso while a fourth ICE agent stood a short distance away.   He also determined that, because they acted on an inchoate and unparticularized suspicion or hunch, Defendants unlawfully seized Wodesso. Given those determinations and the fact that Wodesso consented to a search of his luggage immediately after his unlawful seizure, Judge Scoles recommended that the fruits of the search be suppressed.  After slightly modifying Judge Scoles' factual findings and adopting

his legal analysis, the court granted the motion to dismiss. Shortly thereafter, the court ordered that Wodesso be released from the Linn County Correctional Center. The government eventually sought to dismiss the indictment against Wodesso. On August 16, 2010, the court granted the government's request to dismiss.

### E.  Wodesso's Claim

In the one-count Complaint, Wodesso alleges that, as a result of Defendants' unlawful seizure of him, he was arrested and spent 131 days in jail. He maintains that Defendants acted in a reckless and malicious manner and flagrantly disregarded his constitutional right to be free from unreasonable seizures and his well-being. As relief, Wodesso asks the court to award him compensatory damages, punitive damages, reasonable attorney fees, court costs, interest at the maximum legal rate and other relief if deemed appropriate.

### V.  ANALYSIS

### A.  Parties' Arguments

In the Motion, Defendants ask the court to dismiss Wodesso's claim against them. Defendants argue that the court should dismiss the claim because they are protected from suit by qualified immunity. More specifically, Defendants argue that the facts do not demonstrate that they violated a constitutional right, let alone a clearly established one. Special Agent Lund, Special Agent Anderson and Task Force Officer Tilson dispute whether their own conduct or participation establishes a constitutional violation. Defendants also argue that they are not personally liable because the law does not define in a fairly specific manner the constitutional right at issue in relation to particular conduct.

Wodesso resists. He argues that he unequivocally established Defendants violated his constitutional right to be free from unreasonable seizure and that such right is clearly established. Pointing to the facts that he alleged in his Complaint and the facts that are part of the record in his related criminal case, Wodesso maintains that Defendants seized

him without reasonable suspicion and, thereby, violated the Fourth Amendment's protection against unreasonable seizures. Additionally, he states that clearly established law put Defendants on notice that their actions violated his constitutional right to be free from unreasonable seizures.

### B.  Qualified Immunity Overview

The defense of qualified immunity is not just immunity from liability, but immunity from suit, that is, from the burdens of having to defend litigation. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *accord Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001). One of the purposes of qualified immunity is to minimize "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982); *see also Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987) (observing that qualified immunity exists to balance the competing concerns of providing compensation to a party whose federally protected rights were violated and allowing officials to carry out their public responsibilities in an undeterred, decisive and responsible manner). Therefore, the question of qualified immunity should be decided at the earliest stage possible. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (reiterating the importance of deciding the question of qualified immunity at the earliest stage possible in the litigation).

Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *accord Hunter*, 502 U.S. at 228. It protects an official from personal liability so long as his conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818; *accord Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Anderson*, 483 U.S. at 638-39. What this means in practice is that the court must consider the "'objective legal reasonableness' of the action, assessed in light of the legal

rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639 (citing *Harlow*, 457 U.S. at 818); *see also Brosseau*, 543 U.S. at 198 ("Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.").

Whether a government official is protected by qualified immunity "is a legal question for the court, not the jury, to decide." *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012); *accord Hunter*, 502 U.S. at 228. When deciding if a lawsuit against an official can proceed in the face of the official's assertion of qualified immunity, a two-part inquiry is utilized. *Jones v. McNeese*, 675 F.3d 1158, 1161 (8th Cir. 2012). In one part, the court determines whether the facts demonstrate the deprivation of a constitutional right, and, in the other part, the court determines whether the right was clearly established at the time of the deprivation. *Id.* (quoting *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010)). The court is afforded discretion as to the order in which those parts should be analyzed. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The qualified immunity test has been described as a fair warning standard, that is, an official is on notice that a violation of federal law may lead to personal liability if the federal law was clearly established. *See Hope*, 536 U.S. at 741.

> [For a constitutional right to be clearly established so that qualified immunity does not apply,] the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 640 (internal citations omitted); *see also Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2084 (2011) ("[A] case [need not be] directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *Saucier*, 533 U.S. at 201 (making clear that "clearly established" part of

qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition"); *Wagner v. Jones*, 664 F.3d 259, 273 (8th Cir. 2011) (stating that "[i]t is not enough that a right be established in an abstract sense"). In other words, "'[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.'" *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)); *accord Ambrose v. Young*, 474 F.3d 1070, 1077 (8th Cir. 2007); *Abdouch v. Burger*, 426 F.3d 982, 987 (8th Cir. 2005); *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004).

So, "'[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted.'" *Brosseau*, 543 U.S. at 199 (quoting *Saucier*, 533 U.S. at 201-02); *see also Hunter*, 502 U.S. 228 (explaining that the proper inquiry is whether officials "acted reasonably under settled law in the circumstances, not whether another, or more reasonable interpretation of events can be constructed"); *McCoy v. City of Monticello*, 342 F.3d 842, 849 (8th Cir. 2003) (stating that an official's acts are analyzed "from the perspective of a reasonable officer following customary police practices" rather than "from 20/20 hindsight"). Qualified immunity is not available "if, on an objective basis, it is obvious that no reasonably competent officer would have concluded' that [he] should have taken the disputed action." *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

## C. Relevant Fourth Amendment Precedent

Officers may question an individual, ask for identification and request consent to search luggage without triggering Fourth Amendment protections, so long as they do not give the impression that the individual is required to comply with these requests. *See Florida v. Bostick*, 501 U.S. 429, 434-35 (1991); *see also id.* at 435 ("[E]ven when officers have no basis for suspecting a particular individual, they may generally ask

questions of that individual, [*see INS v. Delgado*, 466 U.S. 210, 216 (1984); *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984)]; ask to examine the individual's identification, [*see Delgado*, 466 U.S. at 216; *Florida v. Royer*, 460 U.S. 491, 501 (1983) (plurality opinion); *United States v. Mendenhall*, 446 U.S. 544, 557-558 (1980) (plurality opinion)]; and request consent to search his or her luggage, [*see Royer*, 460 U.S. at 501 (plurality opinion)]."). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Bostick*, 501 U.S. at 434 (citation omitted) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). On the other hand, a consensual encounter becomes a seizure and, thus, triggers Fourth Amendment protections when an officer, through physical force or show of authority, restrains the liberty of the individual. *Id.*; *see also Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) ("The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation."). To seize an individual without violating the Fourth Amendment, an officer must have reasonable suspicion that the individual is engaging in criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

A court considers the totality of the circumstances when determining whether an officer's interactions with an individual amounted to a consensual encounter or a seizure. *See United States v. Favela*, 247 F.3d 838, 840 (8th Cir. 2001). The Eighth Circuit Court of Appeals considers "seven non-exclusive factors when examining the totality of the circumstances," including: (1) "officers positioning themselves in a way to limit the person's freedom of movement"; (2) "the presence of several officers"; (3) "the display of weapons by officers"; (4) "physical touching"; (5) "the use of language or intonation indicating compliance is necessary"; (6) "the officer's retention of the person's property"; and (7) "an officer's indication the person is the focus of a particular investigation."

*United States v. Aquino*, 674 F.3d 918, 923 (8th Cir. 2012) (quoting *United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008)).

The Supreme Court has addressed the issue of when a consensual encounter becomes a seizure in cases with facts that are similar to the facts at issue here. In *United States v. Mendenhall*, the Supreme Court considered whether two agents of the Drug Enforcement Administration ("DEA") acted lawfully when they approached a suspect in an airport because she fit a drug courier profile, identified themselves as federal agents, asked to see her ticket and identification, asked her to accompany them to a DEA office which was located up a flight of stairs and fifty feet away and proceeded to search her person after obtaining her consent. 446 U.S. at 554-58. Justice Stewart, joined by Justice Rehnquist, concluded that the DEA agents did not violate the suspect's Fourth Amendment protections at any point because the entire encounter was consensual. *Id.* at 559-60. Before reaching such conclusion, Justice Stewart considered the totality of the circumstances. *Id.* at 554. He identified several important facts, including that the events took place in public, the DEA agents were not wearing uniforms or displaying weapons and the DEA agents requested, but did not demand, to see the suspect's ticket and identification. *Id.* at 555. Additionally, he thought it important that the DEA agents simply asked the suspect if she would accompany them to the DEA office, the DEA agents did not use threats or force during the encounter and the DEA agents returned the defendant's identification and ticket before asking her to accompany them to the office. *Id.* at 557-58. The three concurring justices did not pass upon whether a seizure occurred. *Id.* at 560. Rather, they assumed that the stop did constitute a seizure, considered all the circumstances and concluded that the DEA agents had reasonable suspicion that the suspect was engaging in criminal activity. *Id.* at 560-66.

A short time later, the Supreme Court confronted the issue again. In *Florida v. Royer*, two plain-clothes detectives at an airport became suspicious because a suspect fit

14

the drug courier profile.  460 U.S. at 493.  The detectives approached the suspect after he bought his plane ticket.  *Id.* at 493-94.  The detectives asked the suspect if he would speak with them, and he complied.  *Id.* at 494.  The detectives also asked for the suspect's plane ticket and driver's license, and he produced them without orally giving his consent.  *Id.* The detectives became suspicious when they realized that the name on the suspect's ticket did not match the name on his license.  *Id.*  The detectives informed the suspect that they were narcotics investigators and suspected he was transporting narcotics.  *Id.*   The detectives asked the suspect to accompany them to a room forty feet away, and, although the suspect did not orally give his consent, he complied.  *Id.*  The detectives retained the suspect's identification and plane ticket throughout this period.  *Id.*  Once inside the room, the suspect learned that the detectives had retrieved his checked luggage.  *Id.*  Justice White, joined by Justice Marshall, Justice Powell and Justice Stevens, viewed the initial interaction as conduct that did not constitute a seizure.  *Id.* at 501 ("Asking for and examining [the suspect's] ticket and his driver's license were no doubt permissible in themselves[.]").  But, he concluded that,

> when the officers identified themselves as narcotics agents, told [the suspect] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, [the suspect] was effectively seized for purposes of the Fourth Amendment.

*Id.* at 501.  Even though he found a constitutional violation on those facts, he recognized the difficulty in distinguishing between consensual encounters:

> Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an

> unreasonable search or seizure in violation of the Fourth
> Amendment.

*Id.* at 506-07.   Justice Brennan concurred in the result but dissented from the plurality's view that the initial stop was legal.   *Id.* at 511.   Rather than embrace all of the other justices' view that the initial encounter and questioning did not amount to a seizure, he opined that a seizure occurs "once an officer has identified himself and asked a traveller for identification and his airplane ticket."   *Id.*   For varying reasons, the four dissenting justices concluded that no Fourth Amendment violation occurred.   *Id.* at 513-32.

Lastly, *United States v. Johnson*, 326 F.3d 1018 (8th Cir. 2003), is also instructive. In that case, the Eighth Circuit Court of Appeals held that an outdoor encounter near a parked car could not be characterized as completely consensual because one uniformed officer, flanked by two other uniformed officers, approached the suspect, the officers drew him away from another person that he had engaged in a conversation, the officers stood closely at either side of him and an officer asked him what was happening between him and the other person and took possession of his driver's license.   *Id.* at 1022.   Despite the fact that one of the officers politely questioned the suspect, the Eighth Circuit Court of Appeals found that all of the circumstances suggested that an investigative seizure took place.   *Id.* It, however, ultimately concluded that such seizure was justified because the officer had reasonable suspicion that the suspect was about to commit a crime.   *Id.*

### D.  Application

#### 1.    Key facts

Given the law, the facts surrounding the encounter that occurred outside and inside the public airport terminal are highly relevant.   The court finds that the following information is pertinent to its qualified immunity analysis:

> When outside the public airport terminal, Defendants, who had
> varying amounts of training and experience, were standing
> near an interstate bus stop.  Defendants were in plain clothes.
> It was cold and windy outside.

16

Wodesso arrived on an interstate bus. He hurriedly left the bus to claim his luggage. Wodesso's attire included a non-traditional colored baseball cap that he had tilted to one side of his head and shoes with red shoelaces. Wodesso placed multiple pieces of luggage near Special Agent Lund and Special Agent Anderson and left his luggage unattended when he went to speak with a taxi driver.

Rather than call Wodesso over to speak with them, Special Agent Cantrell and Task Force Officer Tilson approached Wodesso after he spoke with the taxi driver. Neither of them positioned themselves in a way that limited Wodesso's freedom of movement. Special Agent Cantrell identified himself and displayed his badge and credentials. Task Force Officer Tilson stood near Special Agent Cantrell and did not speak. Special Agent Cantrell sought Wodesso's identification and asked him several questions. Wodesso handed his commercial driver's license to Special Agent Cantrell and informed him that he was from East Africa and had a criminal history. He also vehemently denied being in a gang. In response to additional questions, Wodesso provided his green card to Special Agent Cantrell. The initial encounter between Wodesso, Special Agent Cantrell and Task Force Officer Tilson lasted only a few minutes because Wodesso agreed to go inside after being asked by Special Agent Cantrell to do so. Before Wodesso gave his consent to move inside the airport terminal, Special Agent Cantrell neither informed Wodesso that he was free to go nor returned Wodesso's license or green card. On the other hand, Special Agent Cantrell did not act or speak in a manner that indicated Wodesso's compliance was necessary.

After deciding to move inside, Special Agent Cantrell lightly touched Wodesso on the shoulder to guide him into the airport terminal and Special Agent Lund, Special Agent Anderson and Task Force Officer Tilson became involved by carrying some of Wodesso's luggage for him.

Once the group moved a few feet to be inside the airport terminal, Special Agent Cantrell deemed it appropriate to display his badge and firearm to alert those who passed by that

a law enforcement encounter was occurring, and he continued to question Wodesso about being affiliated with gangs and having a criminal history.   Meanwhile, Special Agent Anderson and Task Force Officer Tilson stood nearby, and Special Agent Lund called dispatch to verify Wodesso's immigration and outstanding warrants status.   After being allowed to examine Wodesso's tattoos, Special Agent Cantrell asked Wodesso for permission to take a look at his luggage. Special Agent Anderson heard Wodesso give his consent and proceeded to search Wodesso's luggage, which included, among other things, marijuana.

The entire encounter took no more than ten minutes.   When Defendants were interacting with Wodesso, they never conveyed to him that he was the subject of a particular investigation.

## 2.   *Absence of clearly established law*

With respect to precedent that involves airport encounters, it cannot be denied that the situation Defendants faced and the situation that the DEA agents confronted in *Mendenhall* resemble each other.   This is so because the DEA agents were not wearing uniforms, the DEA agents approached the suspect in a public setting, the DEA agents requested, but did not demand, to see identification and the DEA agents requested to move the encounter from one area to another.   There are, however, notable differences: the DEA agents and the suspect were already in the airport terminal; the DEA agents returned the suspect's airline ticket and license before asking her to accompany them; the DEA agents and the suspect moved from a public place to an office which was upstairs and fifty feet away; and the DEA agents never touched the suspect.   As to *Royer*, there are also a number of similarities and differences.   Namely, the detectives approached the suspect in an airport, identified themselves, asked to speak with him and asked for his ticket and identification.   Then, the detectives, while holding onto the suspect's ticket and identification, informed him that he was suspected of transporting narcotics, asked him if

he would accompany them to a private room that was approximately forty feet away and retrieved his checked luggage from the baggage department without his consent.

But, neither *Mendenhall* nor *Royer* state a bright-line rule that sets forth when an officer can ask an individual to move from one place to another during a consensual encounter. *Compare Mendenhall*, 446 U.S. at 559-60 (finding no seizure when agents asked to move the encounter to an office which was up a flight of stairs and fifty feet away), *with Royer*, 460 U.S. at 501 (finding that detectives had seized the defendant when they asked him to accompany them to a police room). Further, other cases establish that an officer is able to question an individual, ask for identification and request consent to search luggage. *United States v. Drayton*, 536 U.S. 194, 200-01 (2002); *see also Bostick*, 501 U.S. 429, 434-35 (1991) (stating what is permitted during a consensual encounter and citing with approval the plurality opinions in *Mendenhall* and *Royer*); *Delgado*, 466 U.S. at 216 (observing that a majority in *Royer* believed that, when the detectives first approached the suspect, questioned him and examined his ticket and license, no seizure occurred); *United States v. White*, 81 F.3d 775, 779 (8th Cir. 1996) ("A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area—even if the officer has no reason to suspect the individual is involved in criminal activity—provided the officer does not indicate that compliance with his request is required."). When considered collectively, controlling precedent does not warn a reasonable officer that a seizure occurs if he and the suspect agree to move from just outside to just inside an airport terminal.

Likewise, no existing precedent hinges just on whether or not an officer holds on to the suspect's identification. Although the return of the suspect's ticket and license was a factor in *Mendenhall* and the failure to return the suspect's ticket and identification was a factor in *Royer*, other factors were considered. Indeed, in *Royer*, it was emphasized that the initial consensual inquiry in a public place had escalated into an impermissible

investigatory procedure in a police interrogation room. *See Royer*, 501-03; *see also United States v. Wilson*, 895 F.2d 168, 171 (4th Cir. 1990) ("If the police had not taken the suspect into the private room and had not obtained his luggage without his consent, the Supreme Court presumably would have upheld the approach of the suspect as a mere encounter.").

### 3.    *Seizure*

In light of the law as it stood and the information that Defendants knew at the time they performed their duties, the court finds that Defendants did not transgress any bright lines during their encounter with Wodesso. A reasonable officer, who was aware of the various factors that courts rely on to determine if an encounter remains consensual, could have believed that the encounter between Defendants and Wodesso did not morph into a seizure. At worst, Defendants made a bad guess in a gray area. Defendants' actions throughout the encounter were all actions that reasonable officers could have taken without believing that they had violated Wodesso's Fourth Amendment right to be free from an unreasonable seizure.

Wodesso argues, and the court acknowledges, that he may not have felt free to disregard Special Agent Cantrell and go about his business because either Special Agent Cantrell or Special Agent Lund had possession of Wodesso's license and green card. Wodesso's feelings, however, are irrelevant. For purposes of qualified immunity, all that matters is whether a reasonable officer would have known that a seizure took place.

Here, Defendants could have been reasonably mistaken as to the correctness of their actions or reasonably misunderstood what the law required of them. Even though four plain-clothed officers were present, only Special Agent Cantrell questioned Wodesso while the others stood nearby. In response to Special Agent Cantrell's requests and questions, Wodesso always acted in a consensual manner. He never did or said anything to suggest that he felt intimidated. Additionally, it is clear that the entire encounter lasted between

five and ten minutes and occurred in a public place.  It is also clear that Special Agent Cantrell followed up on his original inquiries and retained Wodesso's license and green card to verify his immigration status and to determine whether he had any outstanding arrest warrants.  Considering that context, a reasonable officer might believe that no constitutional violation occurred as a result of asking Wodesso to move a short distance so that they could be inside the airport terminal, passing Wodesso's identification to Special Agent Lund to run a background check, carrying some of Wodesso's luggage, touching Wodesso on the way into the airport terminal, relocating to a place inside the airport terminal, displaying a gun and badge, standing near Wodesso and examining Wodesso's tattoos.

With the benefit of hindsight, it is easy to say that Defendants could have handled the encounter better.  However, the law of qualified immunity applies where it is not clear to a reasonable officer that he violated an established right.  Because the unlawfulness of the conduct can be debated or legitimately questioned, qualified immunity protects Defendants.

### 4.     *Reasonable suspicion*

As to the question of reasonable suspicion, the law does not provide a "neat set of rules." *Ornelas v. United States*, 517 U.S. 690, 695-96 (1996).  This is so because the "totality of the circumstances" are examined to determine if officers had a "particularized and objective basis for suspecting wrongdoing." *United States v. Arvizu*, 534 U.S. at 273; *see also United States v. Cortez*, 449 U.S. 411, 417 (1981) (observing that the "whole picture" must be taken into account); *Mendenhall*, 446 U.S. at 561 ("The reasonableness of a stop turns on the facts and circumstances of each case.").  And, it is due to the fact that the circumstances are considered from the perspective of the officers, who are "trained to cull significance from behavior that would appear innocent to the untrained observer."

*United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987) (citing *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir. 1983)).

Here, Defendants were outside of an airport terminal.  They had heightened security concerns as a result of recent terrorist events.  It was cold and windy outside.  Wodesso arrived on an interstate bus.  Wodesso attracted the attention of Defendants because he hurriedly got off the bus to collect his luggage and wore attire that they believed indicated gang affiliation.  After collecting his luggage and placing it near Special Agent Anderson and Special Agent Lund, Wodesso left his luggage unattended.  Rather than enter the airport terminal, Wodesso walked over to talk to a taxi driver.  After being approached and questioned by Special Agent Cantrell, Wodesso provided his commercial driver's license and green card to Special Agent Cantrell.  At that point, Defendants knew that Wodesso did not live in the area, was an alien from East Africa, had a criminal record and adamantly denied being in a gang.  Although not one of those specific facts by itself appears to amount to reasonable suspicion, a trained and experienced officer, who is familiar with indicators that can be associated with gang affiliation, airport security regulations, indicators that can be associated with terrorism and immigration laws,[5] could have concluded that reasonable suspicion was supported by the totality of the circumstances.

It is undisputed that the initial encounter between Wodesso and Special Agent Cantrell and Task Force Officer Tilson involved no coercion or restraint of liberty.  And, it is also appears that, at some point, a brief, minimally intrusive stop occurred.  With

_____

[5] The court notes that Defendants emphasize that they were operating under 8 U.S.C. § 1357, which pertains to the powers of immigration officers, 6 U.S.C. § 1112, which authorizes VIPR teams, regulations of the FAA and TSA and specialized information that they possessed as a result of their training.  For various reasons, Wodesso finds fault with using such information to support the reasonableness of Defendants' perspective.  Although relevant to whether reasonable suspicion existed, the court finds that it is unnecessary to discuss in detail this aspect of the case.

respect to those types of stops, the caselaw indicates that it is not always clear whether reasonable suspicion exists in light of the different factual situations that they confront. *See, e.g.*, *United States v. Eustaquio*, 198 F.3d 1068, 1071 (8th Cir. 1999) (concluding that officers could not reasonably suspect the defendant of any criminal activity); *United States v. Hathcock*, 103 F.3d 715, 719 (8th Cir. 1997) (finding encounter at taxi stand to be consensual); *United States v. Polk*, 97 F.3d 1096, 1098-99 (8th Cir. 1996) (finding initial encounter did not constitute a seizure and, even if an investigatory stop occurred, officers had reasonable suspicion warranting such a stop); *United States v. Campbell*, 843 F.2d 1089, 1094 (8th Cir. 1988) (concluding that the circumstances known to the agent at the time the seizure occurred were "sufficient to have aroused a reasonable, articulable suspicion that criminal activity was afoot"); *see also Campbell*, 843 F.2d at 1094 n. 6 (observing that, in *Royer*, reasonable suspicion existed and, therefore, an investigatory seizure was permitted because the suspect carried heavy luggage, dressed casually and appeared to be between twenty-five and thirty years old, appeared nervous and watchful, paid for a one-way ticket in cash and wrote an assumed name and destination on his baggage identification tag). In light of the law and the information that Defendant's possessed at the time they asked Wodesso to move inside the airport terminal, the court finds that Defendants are entitled to qualified immunity.

## VI. CONCLUSION

Based on the foregoing, the court concludes that Defendants did not violate clearly established law. At the time Defendants acted, federal law was not clearly established in a sufficiently particularized manner. And, the reasoning or premise of relevant federal cases does not have clear applicability to the facts at issue in this case. In light of pre-existing law, it cannot be said that it was apparent that Defendants' actions were unlawful. A reasonable officer could believe Defendants' actions were lawful in light of the law and the information that they knew at the time they acted. Because they acted in an objectively

reasonable manner, Defendants are entitled to qualified immunity.   Accordingly, the Motion (docket no. 15) is **GRANTED**.  The instant action is **DISMISSED** and the Clerk of Court is **DIRECTED** to **CLOSE THIS CASE**.

**IT IS SO ORDERED**.

**DATED** this 10th day of December, 2012.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA